PRINCE & COMPANY, Respondent, v. ST. LOUIS COTTON COMPRESS COMPANY, Appellant.

St. Louis Court of Appeals, April 18, 1905.

1. **BAILMENT: Act of God: Negligence of Bailee.** Where property stored in a warehouse was damaged by an extraordinary and unprecedented flood, if the warehouseman, after being forewarned of the coming flood, failed to exercise ordinary prudence and diligence to remove the property to a place of safety, he was liable to the owner for the damage.

2. ————: **Negligence of Bailee: Measure of Damages.** In an action by the bailor, for damages to his cotton, stored in the warehouse of the defendant, caused by the latter's negligence, the measure of damages was the market value of the cotton if it had not been damaged, less the sum realized on a fair sale for it in its damaged condition, plus a reasonable expenditure for preparing it for market, the market value to be taken at the time the owner demanded possession and not at the time the damage was done.

3 **PRACTICE: Defining Instruction. "Burden of Proof."** It is not error to refuse an instruction which tells the jury that the "burden of proof" is on the plaintiff, where the instruction does not define or qualify the phrase.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

AFFIRMED.

*Joseph W. Lewis* for appellant.

(1) When property, stored in a warehouse is damaged by an act of God, the owner of the property, in order to hold the warehouseman liable for such damage, must prove (1) that the warehouseman was negligent

in failing to exercise ordinary diligence in the care of the property, and (2) that such negligence was the proximate and immediate cause of the damage. No evidence was before the court showing that the damage to plaintiff's cotton was due to defendant's negligence and the court should have instructed the jury to return a verdict for defendant. Davis v. Railway, 89 Mo. 340, 1 S. W. 327; Turner v. Hoar, 114 Mo. 355, 21 S. W. 737; James v. Railroad, 69 Mo. App. 429; American Brewing Association v. Talbot, 141 Mo. 674, 42 S. W. 679; Grier v. Railway, 84 S. W. 158; Hunt Bros. v. Railway, 74 S. W. 69; Deering v. Railway, 13 Gray 481; Hoadley v. Transportation Co., 115 Mass. 304; Morrison v. Davis, 20 Pa. 171; Long v. Railway, 147 Pa. 343; Herring v. Railway, 45 S. E. 322; Railway Co. v. Reaves, 10 Wall. (U. S.) 176; St. Louis, etc., Co. v. Ins. Co., 139 U. S. 223, (2) The burden of proof was upon the plaintiff not simply to show negligence on the part of the defendant, but that such negligence was a direct and proximate cause of the loss. Coleman v. Railroad, 36 Mo. App. 476. (3) A warehouseman is under no obligation to save the property of one person in preference to that of another, or even in preference to its own property. Standard Milling Co. v. Transit Co., 122 Mo. 258, 26 S. W. 704. (4) If property is injured by a wrongful act, the measure of damages is the difference between the market value of the property at the time of the wrongful act, and its market value after the injury is sustained, together with a reasonable allowance for expenses incurred in preserving and restoring it. Harrison v. Railway, 88 Mo. 628; Redmond v. Railway, 90 Mo. App. 68; Reynolds v. Telephone Co., 81 Mo. App. 223-231; Meshke v. Van Doren, 16 Wis. 319; Sedwick on Damages, chapters XIV and XV.

*Judson & Green* for respondent.

(1) We concede that it was the duty of respondent to show: (a) that appellant was negligent in failing to

exercise ordinary diligence in the care of the property; and (b) that such negligence was the proximate cause of the damage. But there was abundant evidence to justtify the submission of those issues to the jury. Smith v. Meegan, 22 Mo. 150; Merchants & Miners Trans. Co. v. Story, 50 Md. 4; Hamilton v. Elstner, 24 La. Ann. 455; Michaels v. New York Central R. Co., 30 N. Y. 568; Brash v. St. Louis, 161 Mo. 438; Newcomb v. Road, 169 Mo. 427, 69 S. W. 348; Schouler on Bailments, sec. 74. (2) This case is radically different from the case of Grier v. Terminal, 84 S. W. 158, in that the evidence in the Grier case showed that the goods in question had been loaded into a car and run onto an embankment high enough to protect them from the highest water; but the damage was caused by the unexpected and unforeseen undermining and washing away of the embankment upon which the car had been placed. In this case, it is admitted by appellant that the danger to the cotton and its liability to damage in the exact manner in which it was damaged had been known and foreseen by it for at least six days prior to the injury; and respondent proved that by the exercise of ordinary diligence appellant could have moved this cotton in time to avoid the injury. This case also differs widely from that of Brewing Co. v. Talbot, 141 Mo. 674, in that the defendant in the Talbot case had received no notice of the threatened danger, and, therefore, could not be guilty of negligence in not moving the goods of plaintiff. (3) The court was bound to refuse instruction No. 5 offered by appellant, because it is improperly worded, in that it does not define what is meant by the term "burden of proof," and placed no qualifications or limitations upon respondent's onus. Clark v. Kitchen, 52 Mo. 316; Anchor Milling Co. v. Walsh, 37 Mo. App. 567.

STATEMENT.

Omitting caption, the petition on which the case was tried is as follows:

"Plaintiff for his amended petition states that defendant is a corporation organized under the laws of the State of Missouri and is engaged in the business of conducting public warehouses for the storage of cotton in the cities of St. Louis, Missouri, and East St. Louis, Illinois, and was the owner of two cotton warehouses in East St. Louis, Illinois, known as warehouses numbers 1 and 2.

"Plaintiff further states that prior to the first day of June, 1903, defendant had stored in its said warehouse No. 1, in East St. Louis, Illinois, 141 bales of cotton belonging to plaintiff. That by the terms of the contract under which defendant stored and held said cotton, said defendant promised and agreed with plaintiff that it would use all due care and diligence to safely keep said cotton and deliver it back to plaintiff, or to any one to whom plaintiff might designate, in good condition upon the termination of said bailment, and plaintiff on his part agreed to pay defendant the reasonable and customary charges therefor.

"Plaintiff further says that on or about the seventh day of June, 1903, said warehouse No. 1 of defendant in which said cotton was stored was flooded by the waters of the Mississippi river and said cotton of plaintiff was greatly injured and damaged thereby, and the said injury and damage to said cotton was caused by the negligence of the said defendant in the following particulars:

"1.   By its negligence in erecting said warehouse in a dangerous and unsafe place, which it knew, or by the exercise of ordinary care might have known, was subject to be frequently overflowed by the waters of the Mississippi river.

"2.   By its negligence in failing and refusing to remove said cotton to its warehouse No. 2, in East St.

Louis, which was erected on high ground in a place safe from overflow and in which there was then abundant room for said cotton, or to some other safe place, upon the request of plaintiff, and after it knew of the imminent danger which threatened said cotton by the flooding of said warehouse No. 1, and which it could have done.

"3. By its negligence in not removing said cotton from said warehouse No. 1, to some more safe and suitable place during the long interval of time, amounting to some eight or ten days, which elapsed after said defendant received notice as to the time when said flood would reach St. Louis, and as to the height, extent and duration thereof, from the weather reports issued by the United States Government, and from the daily public press, and from plaintiff himself after it had expressly promised to plaintiff that it would do so, and had thereby prevented plaintiff from moving it himself.

"Plaintiff further says that by reason of the said negligence of defendant his cotton was soaked with the muddy waters of the Mississippi river, and was discolored and damaged, and was delivered back to him by said defendant in said damaged condition and he was compelled to incur large expenses in having it dried, picked, cleaned and put into a marketable condition, and by said flooding the said cotton was greatly depreciated in value, all to his damage in the sum of $3,500.

"Plaintiff further says that he has demanded payment of said damages from defendant, and defendant has refused to pay the same, or any part thereof; wherefore, he prays judgment against defendant for the sum of $3,500."

The following (omitting caption) is the answer:

"Now comes the defendant in the above entitled cause, the St. Louis Cotton Compress Company, and in answer to the petition of plaintiff, denies each and every allegation in said petition contained.

"And further answering the defendant states that the location, nature and surroundings of its warehouse,

situated in the city of East St. Louis, State of Illinois, to which reference is made in plaintiff's petition as the warehouse in which was stored the cotton in said petition described, were well known to the plaintiff when said cotton was delivered for storage in said building or warehouse on the account of the plaintiff, and long prior thereto; and defendant further states that said cotton was stored in said warehouse by the order and direction of plaintiff.

"And further answering the defendant states that whatever injury and damage was sustained by the cotton of plaintiff, described in the petition, was due to an act of God, in an unusual flood of the Mississippi river, which the defendant could not have foreseen, or anticipated, and could not have guarded against.

"Wherefore, defendant prays to be hence dismissed with its costs in this behalf sustained."

The evidence shows, as alleged in the petition, that defendant owns two warehouses in East St. Louis which it uses for the purpose of storing and compressing cotton for its customers. One of the warehouses, designated as No. 2, is located on high ground in the city of East St. Louis; the other one, No. 1, is located south of the city, on bottom land, east of the Conlogue dike, on ground from ten to twelve feet lower than that on which No. 2 is situated. The Southern Railroad Company has switch tracks running on either side of warehouse No. 1, and cars can be loaded or unloaded into or from the warehouse on either side, and the evidence shows that from two to three thousand bales can be unloaded from the warehouse daily.

Plaintiff is a cotton buyer and on June 4, 1903, had stored in warehouse No. 1, four hundred and eighty-five bales of cotton, which he had bought from other merchants and which was stored in defendant's warehouse at the time of purchase. Plaintiff ordered this cotton removed to warehouse No. 2 by the following letter:

"St. Louis, June 4, 1903.

"Mr. Lessor, Pres, St. L. Cot. C. Co., City.

"Dear Sir: We are ready to pay the cost of transferring our cotton, marks as attached, to the old press as we think it would be safer from flood if there, but we leave it to you to do as you think best, as your company is responsible for its care in either place.

"Yours very truly,

"L. L. PRINCE & CO."

The receipt of this letter was acknowledged by defendant of the morning of the following day by letter stating that orders had been given for cars to be sent to the warehouse for the purpose of removing the cotton from warehouse No. 1. On June sixth defendant wrote plaintiff as follows:

"St. Louis, June 6, 1903.

"Messrs. L. L. Prince & Co., City.

"Dear Sir:

"Since writing our letter by mail, it has occurred to me that I had better notify you that in order to protect your interests fully why don't you change the destination of the cotton from No. 1 to No. 2 house by shipping it to a place of safety entirely away from East St. Louis? This could easily be done by you if you wish it so.

"Yours truly,

"ST. LOUIS COTTON COMPRESS CO.,

"JULIUS LESSER, President."

On the same date plaintiff replied as follows:

"St. Louis, June 6, 1903.

"Mr. Lesser, Pres. St. L. Cot. Co., City.

"Dear Sir:

"Yours of the 6th received. We did not order our cotton moved but left it to your discretion. It certainly is at the risk of your company while being moved as at all other times while we hold their receipts. We certainly hold the company responsible for the good care

of our cotton. They know the danger, and have known it quite a long time.

> "Yours very truly,
> "L. L. PRINCE & Co."

Other letters passed between the parties on the same and following day, discussing the then threatened danger from the high stage of water in the Mississippi river, and the liability of defendant should the plaintiff's cotton be damaged by overflow from the river.

L. L. Prince (plaintiff) testified that he was familiar with the location of defendant's warehouse and was apprehensive of danger and, about 4.30 p. m. on Saturday, June sixth, in company with his son, visited warehouse No. 1 and found one hundred and forty-one bales of his cotton still there. He testified that at that time there were about thirty empty cars and an engine standing on the railroad switches at the warehouse, and that he inquired of Welch, superintendent of the warehouse, why all of the company's cotton had not been removed to warehouse No. 2; that Welch replied he expected to remove all of it next morning, that they would work all day Sunday but had orders to ship other cotton (which they were then doing) and could not remove plaintiff's cotton until the next day. Witness stated that they were then about to stop work at the warehouse and the waters of the river were within a foot or a foot and one-half of the top of the dike and a good deal of seepage water was around the warehouse, halfway up to the axles of the cars standing on the switches; that they were paying off the men when he left at 5:30 o'clock p. m.

On the night of June sixth the dike broke, the warehouse was flooded and plaintiff's cotton submerged. The waters did not subside so the cotton could be handled until June thirteenth when, the evidence shows, plaintiff demanded his cotton and got possession of it, dried and picked it and afterwards sold it on the market from time to time, realizing $43.50 per bale.

Mr. Prince further testified as follows:

"I saw Mr. Lesser (president of the Compress Company) in his office and told him I was alarmed about the flood. Mr. Lesser stated he was not alarmed. A few days later I saw him again, and he said to me: 'If you have any cotton to ship out on orders, ship it out, but don't move any on account of the water.' That was about the twenty-eighth or thirtieth of May. I was much alarmed. I had other conversations with him and on June fourth I met him on the street. My son was with me and Mr. Uphaw was present. Mr. Lesser said: 'You seem to be very much worried about your cotton, and you have reason to be so; if you give me an order to move that cotton, we will move it right away; but it will cost you something. It cost me $4 a car to move it.' I said, 'Not $4 a car. It is two switchings at $1.50 each, but I will pay whatever it is and I will give you an order to move it.' He said, 'Well, send me an order, and I will move it right away.' "

The order of June fourth for the removal of the cotton followed this interview.

Edward H. Bowie, in charge of the United States Weather Bureau, testified as follows:

"Our gauge is located down at the foot of Market street, and the mark termed O corresponds to the low water of December, 1863. So that all these readings we give are in feet and tenths above that low water mark of 1863. These readings I give you are made at six o'clock in the morning; May 30, 24. 8; May 31, 25. 6; June 1, 27. 8; June 2, 29. 9; June 3, 31. 2; June 4, 32.1; June 5, 33.5; June 6, 34.7; June 7, 36.3; June 8, 37.3; June 9, 37.4. How far do you want to go with this?

"Q. The tenth, stop at that? A. June 10, 37.9."

Witness further testified that the maximum height was 38 feet on June tenth; that on May thirty-first the bureau issued the first forecast for dangerous floods in the Missouri river, and on June first, the first warning for St. Louis; that on June second a bulletin was issued

giving notice that the Mississippi was above the danger line at all points in the St. Louis district, and that the river at St. Louis would continue to rise rapidly, and on June fifth the following warning from the bureau was published:

"A stage of 35.0 feet at St. Louis will be reached by Saturday noon; 36 feet Sunday night, and a stage of 37.0 to 37.5 feet by Tuesday. Measures to protect property should be taken."

On the morning of June sixth the following was published:

"At St. Louis the rise will continue rapid through the next forty-eight hours, and the crest stage of 37.5 feet forecast yesterday for Monday or Tuesday appears certain of being reached, and measures to protect property from a stage of 37.5 to 38.0 feet should be taken."

Witness also testified that these warnings and bulletins were published in all the St. Louis daily papers, and Mr. Lesser, president of the defendant company, said he got the morning dailies during the flood period and watched the weather bureau's bulletins and warnings very closely. He testified that in 1892, the Mississippi river reached a stage of thirty-six feet above low water mark. The stage reached June 10, 1903, was the highest since 1844, when the water was forty-one and four-tenths feet above low water mark. The Conlogue dike withstood the flood of 1892.

Defendant's evidence shows that the walls of warehouse No. 2 were out of plumb and in bad condition, that the roof was leaky but its contents were protected by tarpaulins spread on the roof. This warehouse was not reached by the waters of the flood of 1903 and its contents were not damaged.

J. M. Woodman testified that he was yardmaster of the Wiggins Ferry Company in East St. Louis and was acquainted with defendant's warehouse No. 1; that the switching facilities were good in June, 1903, and that on the afternoon of Saturday, June sixth, he was in-

structed by the president of the Wiggins Ferry Company to place all the necessary cars on defendant's switch; that he put in some cars in the afternoon and told defendant's foreman that he was there to do what he wanted done, and the foreman replied that the Southern Railway Company had already placed the cars and he was not needed; that the foreman of the Wiggins Ferry Company's yards afterwards reported to him he had put thirty-two cars on defendant's switches.

The officers and agents of the Southern Railroad Company, in East St. Louis, testified that their road was the only road having access over switches into defendant's warehouse No. 1 in June, 1903, but that the Terminal Railroad Company had access over these switch tracks; that all the orders and requests for cars, made on the Southern Railroad Company, by defendant company, were filled promptly and the railroad company could have furnished the power to remove the thirty-two cars that were pushed on defendant's switches on the afternoon of June sixth. On the part of the defendant the evidence tends to show that warehouse No. 1 was protected by the Conlogue dike, which is twenty feet above the general surface, and that defendant's officers believed the dike to be sufficient to withstand a rise of thirty-six feet. The city engineer of East St. Louis felt very confident that the dike was good to withstand a thirty-six foot rise and the officers of the defendant company did not apprehend danger to the warehouse, unless the river should reach a higher stage than thirty-six feet above low water mark.

Defendant's evidence shows that in the first week of June, 1903, it had from eighty-five hundred to nine thousand bales of cotton stored in warehouse No. 1; that in the usual way the company removed from four to six hundred bales daily, and for the first six days in June the following daily shipments were made: On the first, six hundred and ten bales; on the second, two hundred and twenty-five bales; on the third, twelve hundred

bales; on the fourth, nine hundred and twenty-five bales; on the fifth, seventeen hundred and fifty bales, and on the sixth, seventeen hundred and fifty bales, belonging to divers parties. Its evidence tends to show that during the first week in June there was a great rush for cars in East St. Louis; that everybody became alarmed and wanted to move and there was a good deal of confusion and irregularity in railroad service, and it was difficult to secure cars on account of the great rush and confusion; that defendant made every effort in its power, by telephone, written orders and by personal visits to the offices of the railroad companies of East St. Louis, to secure cars, and employed an extra force to load cars and did all in its power to get the cotton of plaintiff and its other customers removed from warehouse No. 1, and that it promptly loaded all cars that it was able to get switched to its warehouse. In respect to the cars that were pushed on its switches  on Saturday, June sixth, defendant's evidence is that it had a good force of hands at work loading cars; that it paid these hands about 5.30 o'clock in the afternoon, and gave them instructions to return the next day to load the balance of the cotton in the warehouse, then about twenty-seven hundred bales. Welch, the superintendent of the warehouse, testified that as fast as the men were paid their wages they "sneaked off," but on cross-examination he would not state that he asked them to stay and work, but said he expected to get all the cotton removed the following day. In respect to the loaded cars on the switch  submerged  during  the night, Welch testified as follows:

"I did not ask the yardmaster to take out these cars because he couldn't. The Wiggins' engine was the last one there. The Southern engine was there between three and four o'clock and left the cars which the Wiggins' engine pushed in. I did not ask the Southern man to come back that night. He told me he took his engine to Brooklyn. I did not telephone to the Southern office. It would be just as good to telephone to the moon as to the Southern

Railway office. They had too much of their own business. We did not load up."

The eveidence also shows that defendant's officers and agents at the warehouse on June sixth, did not apprehend that there was immediate danger of a break in the dike.

The court refused to nonsuit plaintiff, on motion of the defendant, and submitted the case to the jury on the following instructions:

"The court instructs the jury that between May 30th and June 7, 1903, the defendant company was a public warehouseman engaged in the business of storing cotton for hire, and as such it was the duty of its officers and employees to exercise such reasonable care and foresight, and to make such diligent and energetic efforts to prevent damages or injury to the cotton of plaintiff which was stored with it, as men of ordinary prudence and foresight would have exercised in caring for their own property of the same kind in the same situation and under the same or similar circumstances and conditions, whether requested by plaintiff to do so or not; the court further instructs you that if you find from the evidence that on and after May 30, 1903, the said warehouse No. 1, of defendant was known by its officers to be in continually increasing danger of being flooded or overflowed by the waters of the Mississippi river, then the degree of care, foresight and diligence required of said officers and employees of defendant in protecting said cotton from said flood or in removing it to a place of safety increased in proportion as the danger to said cotton increased; and if you believe and find from the evidence that said officers and employees of defendant or any of them failed at any time between the said thirtieth day of May and the seventh day of June, 1903, to exercise such degree of care, foresight and diligence in protecting said cotton from the said flood or in removing it to a place of safety as men of ordinary prudence and foresight would have exercised in protecting their own property of the same

kind in the same situation and under the same or similar circumstances and conditions, and that by reason of said failure plaintiff's cotton was damaged, then your verdict should be for plaintiff.

"The court instructs the jury that if you find in favor of plaintiff your verdict should be for the difference between the reasonable market value of the 141 bales of cotton in its damaged condition on June 30, 1903, and the reasonable market value thereof at that time if it had not been damaged; to this sum the jury may also, if you see fit, add the interest thereon at six per cent per annum from October 20, 1903, the date plaintiff demanded payment from defendant.

"The court instructs the jury that though they may find from the evidence that the damage to plaintiff's cotton was caused by the high water or flood mentioned in the evidence, yet if they believe from the evidence that the cotton of plaintiff might have been saved from any damage by the exercise of ordinary care by the defendant or its employees, then the defendant is liable for the damages done or the loss suffered by the plaintiff, and the jury are instructed that the degree of care or effort required of the defendant was such as could be reasonably expected of persons of ordinary common sense and prudence engaged in the same or similar business as defendant and under the same or similar circumstances as shown by the evidence.

"The jury are instructed that the defendant was not bound to single out plaintiff's cotton and save it before all other cotton in the warehouse of defendant. It was the duty of the defendant to use such diligence and make such efforts to save all the cotton in its care and custody as would under all the circumstances be reasonable, or as would have been made under all the circumstances by men of ordinary prudence. If, therefore, you believe from the evidence that the defendant company used ordinary care or diligence in its efforts to save

the plaintiff's cotton from damage by flood, your verdict. must be for the defendant.

"The court instructs the jury that the defendant company is not liable to plaintiff for any damage to his cotton unless caused by the negligence of the defendant company as explained in these instructions; the court further instructs you that the defendant company is not liable for any loss or damage to plaintiff's cotton caused by reason of the flood or high water, unless under all the circumstances shown in evidence you find that by the exercise of ordinary care, the defendant could have foreseen the danger by flood and by the exercise of ordinary care and diligence could have prevented or have avoided the damage to plaintiff's cotton.

"The burden of proving any negligence on the part of the defendant, that is to say, the burden of proving that defendant did not exercise ordinary care as explained in these instructions, rests upon the plaintiff, and unless the plaintiff has established by a preponderance or greater weight of evidence that the defendant was negligent as explained in these instructions, your verdict must be for the defendant.

" 'Ordinary care, foresight and diligence,' as the terms are used in these instructions, mean such foresight and diligence as a person of ordinary sense or prudence engaged in the same business or similar business might reasonably be expected to use under the same or similar circumstances."

A verdict signed by ten of the jurors, assessing the plaintiff's damages at three thousand and nine dollars, was returned. A motion for new trial proving of no avail, defendant appealed.

BLAND, P. J. (after stating the facts).—1. The defendant contends that the plaintiff should have been nonsuited, for the reason the damage to his cotton was caused by an extraordinary flood, over which the defendant had no control, and that defendant's negligence, if

it was negligence, was not shown to have co-operated with the act of God to produce the injury. If we correctly understand this contention, it is that defendant is not liable unless it had something to do with the construction of the Conlogue dike or some duty to perform in respect to keeping it in repair, or was required to build it to a greater height for the purpose of protecting its warehouse, and neglected to perform this duty. Suppose A should erect his warehouse in such close proximity to a railroad track (not used or expected to be used for trains to travel on) that a train of cars running on the track would strike and demolish it, and should receive and store the goods of B in this warehouse, and afterwards be notified, in time to move the goods, that a train of cars was approaching and would run over the track and, after receiving the notice, make no effort to remove the goods, and the train should come along and strike his warehouse and damage B's goods, could he answer a claim of B for damage to his goods, that he had no control over the train that struck his warehouse and was therefore not liable? The question furnishes its answer. By parity of reasoning, if the defendant received warning and knew, as its officers testified they did know, that the danger of its warehouse being flooded from the waters of the river was hourly increasing and that the dike was liable to break or be overflowed at any hour, can it be said that it was not negligent, if it failed to make every reasonable effort in its power to remove the cotton its consignors had entrusted to its care, from the threatened danger to a place of sefety? The defendant was powerless to stop the rise in the river and it was under no legal duty to improve the dike to prevent its breach or overflow by the waters of the river. But it did owe the duty to its customers to exercise ordinary care and diligence to remove their cotton to a place of safety after it saw that the same was likely to be submerged, and we think the court properly refused to nonsuit the plaintiff.

The cases of Davis v. Railroad, 89 Mo. 340, 1 S. W. 327; Turner v. Harr, 114 Mo. 335, 21 S. W. 737; Coleman v. Railroad, 36 Mo. App. 476; Green v. Ins. Co., 69 Mo. App. 429, and American Brewing Ass'n v. Talbot, 141 Mo. 674, 42 S. W. 679, cited and relied on by the defendant, are not in point, for the reason the facts in each of them are radically different from the facts developed on the trial of this case. The controlling question in the case is, not whether or not defendant could have controlled the flood, or whether or not its negligence contributed to the crevice in the dike, but whether or not being forewarned that the stage of the water in the river would be so high as to overflow or breach the dike and flood its warehouse and damage the cotton stored therein, it exercised ordinary prudence and diligence to remove the cotton from the threatened danger to a place of safety. We think there was sufficient evidence to warrant the court in submitting this issue to the jury and that in no view of the case would the trial court have been justified in withdrawing the case from the jury.

2. Defendant contends that the court erred in admitting the testimony of Mr. Prince, that he demanded the cotton on the thirtieth of June and that it could have been delivered to him on that day, but he did not know on what day cars could have been gotten to the warehouse to haul it away, and erred in selecting June thirtieth as the date on which the market value of the cotton should be estimated. Its contention is that as the cotton was submerged on June seventh, that date should have been taken as the date when the damage was done and when defendant's negligence, if it was negligence, produced its inability to deliver the cotton. The market value of cotton, according to some of the evidence, was a fraction of a cent higher on June thirtieth than on June seventh, and for this reason defendant's contention demands consideration. If plaintiff had demanded its cotton on June seventh, defendant could not have de-

livered it and its failure to deliver might have been treated by plaintiff as a conversion of the cotton and defendant been held liable for its full value on that day, provided it could not have shown its failure to make delivery was caused by the act of God. But no such demand was made, and it appears to us that the true measure of the damage is as the learned trial court instructed, that is, the market value of the cotton on the day the demand of delivery was made, less the sum realized on a fair sale of the cotton in its damaged condition, plus a reasonable expenditure for preparing it for market.

3. The defendant asked and the court refused the following instruction:

"The court instructs the jury that the burden of proof in this case is upon the plaintiff, and that in order to recover from defendant for the damages to plaintiff's cotton, while stored in defendant's warehouse, the plaintiff must prove that the defendant company in caring for the cotton of plaintiff was negligent and did not exercise ordinary care as defined in these instructions; and the plaintiff must also prove, in order to recover, that the loss or damage sustained by him would not have occurred had the defendant exercised ordinary care."

"The burden of proof" is a technical legal phrase and means that the burden is coextensive with the legal proposition sought to be proved and applies to every fact which is essential to or necessarily involved in the proposition (Wilder v. Cowles, 100 Mass. 487), or as said in Siefke v. Siefke, 3 Misc. Rep. 81, citing People v. McCann, 16 N. Y. 58, it means, "An obligation imposed on the party who alleges the existence of the fact or thing necessary in the prosecution or defense of an action to establish it by proof." It could not be expected that the jury would correctly interpret the phrase. See Clarke v. Kitchen, 52 Mo. l. c., 317 where SHERWOOD, J., speaking of the words "preponderance of evidence," said: "The words, 'preponderance of evidence,' are with the average juror sus-

ceptible of, and very likely to receive, almost an infinity of construction." The same criticism justly applies to the words, "the burden of proof." Conceding then the burden of proof was on the plaintiff, it was, for the reason stated, not error to refuse the instruction in the form it was presented.

4. The defendant asked seven other instructions, which the court refused. We have examined them all with care and find that such of them as announce correct propositions of law are supplied by instructions given. We think the instructions given fairly and fully declare the whole law of the case to the jury, and while the case is a close one on the evidence and a hard one on the defendant, we think the plaintiff made out a prima facie case and that there are no just grounds to warrant us in disturbing the verdict.

The judgment is affirmed. All concur.