GRIER et al., Respondents, v. ST. LOUIS MER-CHANTS BRIDGE TERMINAL RAILWAY COMPANY, Appellant.

St. Louis Court of Appeals, December 13, 1904.

1. COMMON CARRIERS: Loss of Goods: Prima Facie Case. In an action by a shipper against a common carrier, where the petition avers the delivery of goods to the carrier and a failure of the carrier to deliver them to the consignee, a prima facie case is made out by showing a delivery of the goods to the carrier and the failure to redeliver at destination to the consignee.

2. ——: ——: Act of God. And where such proof is made, the burden is then on the carrier to prove that the loss of goods was due to an act of God, if that defense is relied upon.

3. ——: ——: ——: **Negligence.** If negligence on the part of the carrier co-operated with the violence of nature, as where the carrier negligently permitted the property to remain exposed to destruction by a flood, the carrier must answer in damages.

4. ——: ——: ——. The action by the shipper was for the loss of a car load of oats destroyed by a flood. The evidence showed that the car load of oats was placed on the defendant's yard at a point beyond the reach of any flood previously known. It was very difficult to remove the car to a safer place on account of the congested condition of the yards and roads and all the efforts of the defendant were employed in keeping in repair an embankment to prevent general disaster. The destruction of the car was not due to the height of the flood but to the peculiar position of a crevasse formed in the embankment through which the flood poured and overturned the car. *Held,* the loss was due to an act of God unmixed with negligence on the part of the carrier so that it was not liable to the shipper for the loss.

Appeal from St. Louis City Circuit Court.—*Hon. Walter B. Douglas,* Judge.

REVERSED.

*J. E. McKeighan* and *William R. Gentry* for appellant.

The court erred in overruling the demurrer to the evidence, because all the evidence showed that the plaintiffs' oats were lost by the act of God without negligence on the part of the defendant. When such a state of facts is shown, it is the duty of the court to instruct the jury to return a verdict for the defendant. Brewing Assn. v. Talbot, 141 Mo. 674, 42 S. W. 679; Transport Co. v. Ins. Co., 41 Fed. 793; Coleman v. Railway, 36 Mo. App. 492; Hoadley v. Transportation Co., 115 Mass. 304; Herring v. Railroad, 32 Amer. & Eng. R. R. Cases, N. S. 262; Slater v. Railway, 29 Ga. 96; Long v. Railroad, 147 Pa. St. 343; Morrison v. Davis, 20 Pa. St. 171; Denning v. Railway, 13 Gray 481, 74 Am. Dec. 645; Railroad v. Reeves, 10 Wall. 176; Davis v. Railway, 89 Mo. 340.

*Robert C. Grier* for respondents.

To relieve the defendant, in this case a common carrier, from liability for the loss of freight, the "act of God" relied on must have been the exclusive proximate cause of the loss, and in proving the "act of God," the defendant's evidence must not show any negligence on its part co-operating with the "act of God" to cause the loss. If defendant does show that an "act of God" caused the loss and no co-operating negligence on its part appears, then the plaintiff must show that defendant failed to use reasonable care after the unusual force seemed imminent. Davis v. Railroad, 89 Mo. 340, 349; Haney v. Kansas City, 94 Mo. 334, 7 S. W. 417; Woods v. Kansas City, 58 Mo. App. 272; Brash v. St. Louis, 161 Mo. App. 433, 61 S. W. 808; Brewing Co. v. Talbot, 141 Mo. 674, 42 S. W. 679; Wolf v. Exp. Co., 43 Mo. 421; Read v. Railroad, 60 Mo. 199.

GOODE, J.—In June, 1903, there was a great inundation of the east bottom of the Mississippi river opposite the city of St. Louis, resulting in the destruction of much property. A carload of oats which the respondent had entrusted to the appellant for transportation to the city of St. Louis was lost in the flood. The oats were delivered to the appellant June 5, 1903, at 4:30 p. m. by another railroad company over whose line they had been hauled, and the car containing them was immediately placed on the appellant's tracks in the town of Madison opposite St. Louis. The bill of lading was issued about nine o'clock that night, prior to which hour the destination of the oats was not communicated to the appellant. The car was stationed at a high point on the appellant's track; perhaps the highest in its yards. Many railroad lines cross the Mississippi river bottom in that vicinity. The ground traversed by them was protected from overflow by a massive embankment or dike on which ran the Chicago and

Alton railway tracks. This embankment was from twenty to eighty feet wide on top, had withstood several high floods and was the safeguard against the overflow of the country depended on not only by the railway companies, but by many manufacturing establishments and several considerable towns and their inhabitants. About four hundred cars of freight remained in the appellant's Madison yards at the time of the flood, because its yards on the Missouri side of the river were congested with cars on account of the high water prevalent over a large part of the west rendering it impossible to move them. Consequently, there was no room in the Missouri yards to receive the cars from the Madison yards. The car of oats in question stood about a mile and a half south of the Chicago & Alton embankment. Another obstacle to hauling the car promptly to St. Louis was that the Eads Bridge was cut off by the waters and could not be used, and the appellant's bridge (Merchants Bridge) was so crowded with passenger and mail trains, which ordinarily used the Eads Bridge, but were then forced to use the Merchants Bridge, and with a construction train engaged in strengthening said bridge and its approaches, that freight trains could not be sent over it. At midnight June 6th, the Merchants Bridge was deemed unsafe and traffic over it was stopped and not resumed until noon, June 7th. For several days prior to the last date many citizens and railroad employees had been engaged in strengthening the Chicago & Alton embankment; but it gave way at eleven o'clock on Sunday morning, June 7th, and a deluge of water rushed through the crevasse with the force of a torrent, overflowing a large part of the bottom and destroying a great deal of property, including the respondents' oats. We gather that the water of the river never rose high enough to run over the top of the dike and that the inundation would not have occurred but for a crevasse forming. It was shown the Mississippi and Missouri rivers, particularly

the latter, were in flood over a large part of their course for days preceding the overflow at Madison and that predictions were sent out by the United States Weather Office from day to day as to the stage to which the water would rise in the next twenty-four hours. These warnings showed the height of the flood at the points on the river above St. Louis, contained prognostications as to the danger to be apprehended at the latter point and in the lowlands opposite, and called attention to the importance of taking measures to avert loss of life and property.

Though the answer is a general denial, the defense is that the loss of the carload of oats was due to the act of God and, therefore, the appellant, as a common carrier, is not responsible for it. The petition stated a case in the nature of trover, averring merely the delivery of the oats to the appellant as a common carrier and a failure on appellant's part to deliver them to the consignee. The main assignment of error is that the trial court refused to order a verdict for the appellant on the entire proof, and this is the only proposition we find it necessary to consider. The jury returned a verdict for the respondents and an appeal was taken.

The form of action adopted by respondents imposed on them the task of proving no more, in order to make a prima facie case, than the delivery of the oats to the appellant company for carriage and the failure of the appellant to redeliver them at destination to the consignee. This was done, and the burden then fell on the Terminal Company to acquit itself of responsibility by proof that the loss of the oats was due to a natural catastrophe, or, in legal parlance, an act of God. Davis v. Railway, 89 Mo. 430, 1 S. W. 327. The proposition that the appellant company is not liable even if it negligently permitted the oats to remain exposed to destruction by the flood, after it knew there was danger of such a disaster, has been elaborately argued and briefed by counsel. We do not take

that view of the law and neither do the cases to which we are referred. If negligence on the part of the appellant co-operated with the violence of nature in bringing about the loss of respondent's property, the appellant must answer in damages. Haney v. Kansas City, 94 Mo. 334, 7 S. W. 417; Brash v. St. Louis, 161 Mo. 433, 61 S. W. 808. It is only when an act of God, unmixed with proximate negligence on the part of the carrier, injures and destroys property in the latter's custody, that it is excused from answering to the owner. The cases cited and relied on by the appellant dealt with a state of facts in which, though the carrier was negligent in handling the property consigned to it, its negligence, which consisted in unreasonable delay in transporting the property to destination, did not enter as a proximate cause into the loss of the property; which loss was due, legally speaking, solely to the act of God. Denny v. Railroad, 13 Gray 48; Headley v. Transportation Co., 113 Mass. 304; Morrison v. Davis, 20 Penn. St. 171; Long v. Railroad, 147 Penn. St. 343; Herring v. Railroad, 32 Am. & Eng. Railroad Cases (Va.) 262; Slater v. Railroad, 29 Ga. 96; Northwest Trans. Co. v. Ins. Co., 41 Fed. 793; Railway v. Reeves, 10 Wall. (U. S.) 176; St. Louis, etc., Co. v. Ins. Co., 139 U. S. 223. In all those decisions it appeared the carrier had been guilty of some delay in moving the property, but for which it would not have been where the catastrophe occurred and therefore would have escaped injury. But as the catastrophe happened unexpectedly, and was not within the range of reasonable foresight, the negligent delay was not indulged while the carrier realized there was peril to the property and, therefore, did not participate, as a concurrent cause, in bringing about the loss. The doctrine of the cases cited on this point by the appellant is one that pervades the law of negligence; and by virtue of it a common carrier's neglect, like any other party's, must enter as a proximate cause into the happening of an

injurious accident, to entail liability. But it need not be the sole cause. If it is a contributive one, liability attaches to the carrier. We think the respondents' case is weak, not so much on the ground that the appellant was guilty of negligence in delaying the removal of the car of oats and the inundation supervened subsequently as the separate and sole cause of the loss of the oats, as on the ground that the appellant raised a good defense against respondents' prima facie case by proving the loss was entirely due to the flood; which defense the respondents failed to overcome by substantial evidence to prove the company was negligent in a way that contributed to the loss, if negligent at all.

The first question is, did the appellant repel the prima facie case made by the respondents by showing beyond fair inference to the contrary, that the loss of the oats was due entirely to the flood? We will recite the substance of the testimony introduced for that purpose. During the flood of June, 1903, the Mississippi river rose to the highest stage of water ever known except in the year 1844. The embankment of the Chicago & Alton Railroad Company was, as said above, depended on for protection against an overflow of the river by the appellant company and several railroad companies, as well as by the inhabitants and authorities of the towns in the Mississippi river bottom opposite St. Louis and by the proprietors of many costly manufacturing establishments. It was a very substantial and massive structure and had proved an adequate protection during several other great floods. The officials of those towns, and the employees of railroad companies and manufacturing companies whose properties were threatened by the overflow, strenuously labored to strengthen and preserve the levee for several days before it broke. The testimony shows that most of the interested persons and corporations took it for granted the dike would hold and be high enough to save the adjacent bottom from inundation. It was

high enough, and strong enough, too, except in one place, where the water broke through. It is important just here to determine exactly what was the proximate cause of the loss of the carload of oats. When this car was received the yards were perfectly dry and were expected to remain so. The car was placed on the appellant's track at about the highest point in its yards at Madison and sufficiently high, as the event proved, for the body of the car to be a foot and a half above the water at its extreme stage. The oats would not have been soaked by the mere submergence of the yards, and their destruction was not an incident of that occurrence. The water never rose high enough above the spot of ground where the car was left to run into it; but the current of the stream of water which burst through the crevasse a mile and a half north, hit the railroad embankment exactly where the car of oats stood and washed the dirt from under the rails, thereby capsizing the car. This happened to only three of the sixteen cars which stood on that particular track. In truth, it seems that only eleven of the four or five hundred carloads of freight in appellant's yards were damaged by the overflow. Now who could anticipate that a catastrophe of the sort which befell the carload of oats would happen? The appellant's employees supposed the car stood on a point of ground high enough to insure perfect safety, as in no previous flood had the water ever gone over the roadbed. It was in a position of safety against submergence by the inundation, and its ruin resulted from the force with which the current of the inundating stream ran against the roadbed at that very spot and undermined it. The head of water that burst through the crevasse was twenty feet high and rushed southward to where the car of oats stood immediately in the line of flow, with a current of such strength as to wash away the roadbed. A mishap like that could be foreseen by no one. It was generally supposed the dike would not break; and if a

break might have been anticipated, it was impossible to know at what point it would happen. Much less could any one anticipate that the tide of the inrushing stream would sweep across the intervening bottom for a mile and a half and endanger the car of oats by cutting away the roadbed. All that was necessary in the way of precaution, so far as human foresight could tell, was to put the car where the overflowing waters would not rise to it, which was done. It was in testimony that the stream of the overflow sapped the roadbed; and that this was the mode in which the loss occurred was physically demonstrated by the fact that of the sixteen cars on the same track this one was on, only three fell into the water, and those three stood where the ground was washed from under the track. That the cause of the loss was the act of God, appears clearly and unmistakably.

While the appellant was carrying the burden of proof and trying to show the loss of the oats was due to a natural calamity, the respondent's counsel, in the cross-examination of the witnesses, sought to bring out facts to show appellant was remiss in not moving the oats from the Madison yards. The object aimed at was to establish that the railroad company's officials knew, for days in advance, a great flood was impending, and knew, too, from day to day, the stage of water to which the river would rise in the next twenty-four hours; and having this knowledge ought to have removed the car from the Madison yards, which were liable to be overflowed, to the St. Louis yards, or somewhere else where no danger existed. The same object was kept in view when the respondents resumed the laboring oar in rebuttal, as they were bound to do after the appellant company had made a good defense. Davis v. Railroad, supra; Am. Brewing Assn. v. Talbot, 141 Mo. 674, 42 S. W. 679. We are to inquire then whether during the progress of the testimony offered in defense of the action, or from the evidence introduced by

the respondents in rebuttal, any substantial proof of negligence on the part of the appellant, proximately contributing to the loss, appeared. The peculiar cause of the submergence of the oats, which we have pointed out, is a conclusive answer to this inquiry. The oats were left in a place safe from overflow and where, so far as the course of the flood could be surmised, they were in no danger. That exhausted the appellant's duty; as a carrier is only bound to use ordinary care to prevent injury to freight by the act of God, and cannot be held for failure to guard against a wholly unforeseeable event. But there were insurmountable obstacles in the way of moving the car, if it had been believed it was threatened by the waters. For days preceding the seventh of June, when the dike broke, the Weather Bureau had published notices of the probable rise of the river during each ensuing twenty-four hours and warnings to protect property against damage at a given stage of the water. This fact is much relied on by the respondents. It was shown, too, over the appellant's objections and improperly, we think, that the Chicago & Alton Railroad Company moved cars of perishable freight out of its yards in the Mississippi river bottom to higher ground. This was a precaution taken by a single company with no proof that its facilities for getting cars away were no better than the appellant company's and with positive proof that they were much better. Besides, the track of that company lay lower than the one where respondent's car of oats stood and was likely to be submerged if the levee broke or overflowed. What opportunity or facilities did the appellant have for getting the oats out of its Madison yards? Under ordinary conditions it could use two tracks leading from those yards to its yards in St. Louis on the Missouri side of the river. These tracks crossed its bridge known as the Merchants Bridge. For several days preceding the disaster one of the tracks had been occupied by a construction train

used in the work, then in progress, of strengthening the bridge itself and a viaduct or trestle which led to it. It would not be contended, we take it, that the appellant should have attended to the carload of oats rather than the bridge and its approaches. The other track over which freight ordinarily could be hauled, was occupied constantly by trains carrying the United States mail and belonging to several railroad companies which commonly used the Eads Bridge to get into St. Louis from the Illinois side of the river, but had been driven by the flood to use the Merchants Bridge. Under normal conditions from one thousand to fifteen hundred cars of freight could be hauled from the Madison yards to St. Louis in twenty-four hours. But at that time, by reason of the prevalence of floods for weeks over large areas of the Western States, the appellant had been unable to move cars out of its St. Louis yards and those yards were so congested that no more freight could be received into them. At midnight on Saturday the use of the Merchants Bridge was forbidden as being unsafe. The respondents sought to prove the appellant company could have borrowed yard room from other railroad companies in St. Louis for the storage of cars, or could have borrowed side-tracks and switches along the St. Louis streets on which to stand cars of freight during the emergency. If we grant that such precautions should have been taken, the answer is that all the testimony was that no trackage or yard-room could have been borrowed, as all other yards and tracks in St. Louis were as badly congested as the appellant's. Without going into further details, we will state that a minute examination of the testimony has yielded the conviction that arduous efforts, which strained every nerve and taxed every resource, not only of the appellant's officials and employees, but of the employees of all other railroad and manufacturing companies, and of the officials and many of the citizens of the towns, threatened by the flood were em-

ployed to avert disaster, and that everything humanly possible was done for that purpose. Of course, if greater interests had not been at stake, and particular attention had been given to the car of oats, and if the appellant's officials could have realized there was danger to it, it might have been saved. But speaking with reference to the diligence the law requires in such an emergency, we think there was no evidence of lack of proper efforts to protect the respondents' property. It is easy to pick flaws in the conduct of persons in times of danger and excitement and say if this or that had been done the result would have been different. The appellant's servants might have moved this car of oats on Friday night or Saturday morning to where it would not have been injured, if they had known it was in danger. It would be granting a great deal to say they could have moved it at all, considering that the tracks over the bridge were filled with trains having precedence over freight trains. But looking at the situation, with its many difficulties and serious responsibilities calling for instant attention, we think the facts of this case make a much stronger showing of loss of property by a natural disaster, unmixed with negligence on the part of the custodian of the property, than did the facts of the Am. Brewing Assn. v. Talbot, supra, in which the defendants were exonerated from blame.

The judgment is reversed. All concur.