## MISSOURI, K. & T. RY. CO. v. JOHNSON *et al*.

No. 1352. Opinion Filed July 18, 1912.

Rehearing Denied September 17, 1912.

(126 Pac. 567.)

1. **WATERS AND WATER COURSES**—Injuries From Flowage— **Care Required.** Although a railroad in the original construction of its bridge across a stream, and the roadbed embankment across the adjacent botton lands, may have constructed them so carefully, with regard to the known flood conditions of the river, and those conditions which, from all the circumstances, might be reasonably foreseen and provided against, as to exempt it from liability for flood damages, yet, if subsequent developments proved them insufficient, it would then become the duty of the railroad to improve them, failing in which within a reasonable time, the original construction would not be a defense against an injury occurring after the insufficiency of the construction became known.

2. **SAME.** An act of God, such as an unprecedented rainfall and resulting flood, which will excuse from liability, must not only be the proximate cause of the loss, but it must be the sole cause. If, however, the injury is caused by an act of God, commingled with the negligence of the defendant, as an efficient and contributing concurrent cause, and the injury would not have occurred except for such negligence, the defendant will be liable.

3. **SAME—Evidence—Repairs After Injury.** Evidence of repairs or alterations in a railroad embankment and bridge subsequent to a loss of property in a flood is not competent, as tending to

establish negligence upon the part of the railroad in the original construction of such embankment and bridge.

4. **INTOXICATING LIQUORS—Property Rights—Injury.** Where a man owned and was operating a distillery in the manufacture of whisky under federal supervision, and in a lawful manner, at the time of the admission of the state into the Union, and it is not shown that he has operated or is keeping it for the purpose of being operated in violation of the prohibition laws of the state, section 13 of article 3 of the legislative enactment approved March 24, 1908, does not destroy the property character of such plant, and, if it is destroyed through the negligence of another, it may be recovered for.

5. **SAME.** Where a man, at the date of the admission of the state into the Union, is the owner of twenty barrels of whisky, made by him at his distillery, prior to statehood, under federal supervision and in accordance with the then existing law, which whisky was at the time it was made placed in the possession of a federal officer, where it remained until destroyed in a flood since statehood, held that, in an action against a railroad company for negligently causing the destruction of the goods, a recovery may be had of their value.

6. **WITNESSES—Appeal and Error—Impeachment of Witnesses—Conviction of Crime—Review—Harmless Error.** It is competent to ask a witness if he has been convicted of violating the prohibition laws of this state, on the theory that, if he has been, it affects his credibility; and cases may arise where a correct decision will depend so largely upon the testimony of the witness attacked that to refuse to permit the question would be error requiring a reversal. But, where the evidence of the witness attacked is in substantial harmony with that of unattacked witnesses, and is in a large measure merely cumulative, and is not contradicted by the other side, and it further appears from the other evidence that justice has been done in the case, then the refusal of such impeaching evidence does not require a reversal of the case.

(Syllabus by Brewer, C.)

*Error from District Court, Pottawatomie County;*
*W. N. Maben, Judge.*

Action by B. O. Johnson and Charles A. Mantz against the Missouri, Kansas & Texas Railway Company. Judgment for plaintiffs, and defendant brings error. Affirmed.

*Clifford L. Jackson, W. R. Allen, M. D. Green, E. C. Stanard, J. H. Wahl,* and *C. H. Ennis,* for plaintiff in error.

*H. H. Smith* and *W. T. Williams,* for defendants in error.

Opinion by BREWER, C.  This is a suit to recover damages for loss and injury to property on account of a flood in the

North Canadian river alleged to have occurred October 21, 1908. The action was commenced in the district court of Pottawatomie county on the 23d day of November, 1908, by B. O. Johnson and Charles A. Mantz, as plaintiffs below, against the Missouri, Kansas & Texas Railway Company, plaintiff in error herein, defendant below, wherein it was sought to recover damages on account of the destruction of certain property itemized in the petition. The parties will be referred to here as they were known in the trial court.

The plaintiffs allege as a cause of action, negligence upon the part of the defendant in the construction and maintenance of its roadbed, bridge, and culvert across the North Canadian river and the bottom lands adjacent thereto. For a defense the defendant, after a general denial, pleads the proper construction of its roadbed and bridge by competent and skilled engineers, and, further, the extraordinary, unusual, and unprecedented character of the rainfall causing the flood. After a general denial in reply, the cause was tried to a jury, and resulted in a verdict and judgment for plaintiffs in the sum of $6,000. A motion for a new trial having been overruled, the defendant, as plaintiff in error, brings this cause here for review.

Twenty-two assignments are set out in the petition in error. These have been grouped into six propositions as presented in the brief. Briefly stated, they are: (1) Error in not instructing a verdict for defendant; (2) that the instructions of the trial court were incorrect and abstract; (3) error in allowing a recovery for a distillery plant and a large quantity of whisky; (4) error in refusing to permit defendant to show that one of the plaintiffs had been convicted of violating the prohibition law; (5) error in refusing certain testimony of an expert witness; (6) error in refusing to give a certain requested instruction. We will consider the alleged errors as stated above in the order named, but, before proceeding to do so, will briefly summarize the important facts.

The plaintiffs' farm lay a short distance above and north of the defendant's bridge. The river bottom between the bluffs is very narrow, about 900 feet across, at this farm, and rapidly

widened up the river, until at the distance of a mile the bottom lands are 2,000 or 3,000 feet wide, thus placing plaintiffs' farm in the narrow neck of the valley.   The railroad built an embankment or dump of earthwork from 20 to 25 feet high across this river bottom land, bridging the channel of the river with a wooden structure resting on sets of piling sunk into the ground at intervals of ten to fourteen feet.   The plaintiffs had a dwelling, outhouses, barns, a warehouse, a distilling plant equipped with boilers, engines, stills, tools, etc.   There were a number of cattle, horses, and hogs on the farm, several wagons, buggies, and harness, a large quantity of corn and hay, and twenty barrels of whisky.   Prior to the erection of the state government the plaintiff Johnson was engaged in distilling spirituous liquors under federal supervision, and in accordance with law.   The whisky was distilled under the supervision of a federal revenue officer, was tested, gauged, and kept in the possession of such officer.   For the plaintiff to obtain possession of any package of whisky, he had to pay to and present the receipt of the internal revenue department to the officer in possession of the same.   This being done, revenue stamps were provided for stamping and releasing the goods.   When the Constitution providing for prohibition was adopted, it found the plaintiff with this large quantity of whisky in the government warehouse.   While he was the beneficial owner of it, it was not in his possession.   Nearly all the property mentioned above, including the distillery and whisky, was destroyed. The houses were wrecked and washed away.   The occupants of the dwelling, as it washed away in the torrent of waters, found refuge in trees, from which they were later rescued in boats. The waters were from six to ten feet deep over plaintiffs' land. The water was higher above than it was below the bridge and embankment; the difference varying under the proof from two to four feet.   When the bridge and a part of the embankment went out, the water above the bridge fell rapidly, and within 40 minutes animals that had been swimming could reach bottom and walk out.   There was backwater above the dump.   One witness says this backwater extended up the river nearly a mile. Nearly all the witnesses agree that the rain preceding this rise

in the river was heavier than ever known before. The water on plaintiffs' land was four feet higher than in the flood of May, 1908, a few months before, and the May flood put eight feet more water on plaintiffs' land than had ever been on it in the history of the river. The embankment and bridge were built there about 1903. The plaintiffs suffered damages from the May flood, and sued the defendant for a large sum of money, but that suit seems to have been abandoned, and this present suit brought. If the plaintiffs can recover at all, and the loss of the whisky and still are proper elements of damage, the evidence fully sustains the amount of the verdict.

The first question raised—i. e., the insufficiency of the evidence—cannot be sustained. We may assume that all the proof shows that this flood in October was unusual and unprecedented in the history of this river. We may go further, and concede that, when the railroad embankment and bridge were erected in 1903-04, they were erected skillfully and sufficiently to meet the flood conditions of the river, then known, as well as those that might be at that time reasonably anticipated. If this is admitted, then, if nothing had occurred since the original construction of the road to demonstrate the insufficiency of the construction prior to the October flood, defendant would have been entitled to an instructed verdict. If, however, after the original construction of the road, and prior to the flood in question here, other floods of an unprecedented character came, demonstrating the faulty construction of the roadbed, or the inadequacy of the waterway left under the bridge, then, if such was the case, a new standard of obligation was erected for the defendant, and it was its duty to meet the new conditions thus established.

In *Gulf, C. & S. F. Ry. Co. v. McGowan*, 73 Tex. 355, 11 S. W. 336, the above idea is developed as follows:

"It was required of the defendant to so construct its road, when built, to meet the demands upon it as far as they could be then foreseen and provided for. If it negligently or unskillfully failed to do that, it was liable; but, on the other hand, if the evidence showed that, as the conditions existed and could have been by the exercise of ordinary care and skill ascertained at the time the culverts were constructed they were then made sufficient, and

if nothing had occurred between their construction and the date of the injury to plaintiff to develop their insufficiency, the defendant would not be responsible. * * * Though constructed so carefully originally as to exempt defendant from liability, if subsequent developments proved them insufficient, it would then become the duty of defendant to improve them, failing in which, the original construction would not be a defense against an injury occurring after the defect became known."

The principle involved here is the same as that discussed, in a different class of cases, by Hutchinson on Carriers:

"Sec. 292. But although the carrier will be excused if an act of God occasioned the loss, if it appear that his own misconduct concurred with the act of God in bringing the loss about, he cannot escape liability. He is bound to exercise due care and diligence in view of the attending circumstances to protect the goods intrusted to him for carriage. And this obligation will require that he take such precautions, when the means of doing so are at hand, as are reasonably necessary to avert a threatened danger; and, if a loss ensue through his failure to take such precautions, he will not be permitted to shield himself from liability on the ground that the loss was occasioned by an act of God. He must also take notice of any signs of approaching danger, and, if they are such as reasonably to awaken apprehension and he has the facilities for escape under his control, he must employ such facilities in removing the goods to a place of safety. And in general it may be stated that where the carrier by the exercise of reasonable diligence could have foreseen the happening of an event such as might reasonably be presumed would cause injury to the goods, and he fails to make use of the means at his command to guard against it, and the goods are thereby lost or injured, he will be liable, although such loss or injury would not have happened but for an act of God."

The same author continues:

"Sec. 275. But, while the carrier will be relieved from liability for losses arising from an act of God, it is universally conceded that, in order that he may avail himself of this exception to his liability, human agency must not have intervened."

To support this text, the author cites *Mershon v. Hobensack,* 22 N. J. Law, 372; *Backhouse v. Sneed,* 5 N. C. 173; *Ewart v. Street,* 2 Bailey (S. C.) 157, 23 Am. Dec. 131; *McArthur v. Sears,* 21 Wend. (N. Y.) 190; *The Majestic,* 166 U. S. 375, 17 Sup. Ct. 597, 41 L. Ed. 1039.

It is true the above quotations are from a discussion of the liability of carriers, where they are insurers of the safe delivery of the goods, the duty imposed being higher than the duty involved here, but the underlying principle, to the extent of the duty involved in this case, is applicable.

Without discussing the conflict of authority in cases where damage has resulted from an act of God, but which would probably have been averted but for some precedent negligence of the carrier in not promptly forwarding the goods when he should, or in deviating the course of shipment, yet we think it may be safely stated in the language of Judge Elliott that "if the carrier's negligence is concurrent, or proximately contributes to the loss, the carrier is liable." 4 Elliott on Railroads, 1457a. *Armstrong, Byrd & Co. v. Illinois Central R. Co.*, 26 Okla. 352, 109 Pac. 216, 29 L. R. A. (N. S.) 671. In the case of *Gratiot St. Warehouse Co. v. M., K. & T. Ry. Co.*, 124 Mo. App. 545, 102 S. W. 11, it is said:

"Now, it is well settled law that if the defendant's negligence commingled with and operated as a contributive element proximate to the injury, even though such injury is to some and even a paramount extent operated by the act of God, the defendant will be liable as though its negligence were the entire and sole cause of the loss. In order for the defendant to escape liability under the exemption afforded by the law to the entailments of an act of God, the act of God must be the sole and only cause of the injury, and this, too, unmixed with the negligence of the defendant; for, if the defendant's negligent act commingled with it in the loss as an active and co-operative element and the loss is proximate thereto, or, in other words, is a reasonable consequence of the negligent act, it is regarded in the law as an act of the carrier rather than as an act of God. The principle is manifest from all of the cases, and evidence of its proper application abounds in the books. *Wolf v. Amer. Ex. Co.*, 43 Mo. 421-425, 97 Am. Dec. 406; *Davis v. Wabash R. Co.*, 89 Mo. 340, 1 S. W. 327; *Grier v. Railway*, 108 Mo. App. 565, 84 S. W. 158; *Prince v. St. Louis Cotton Compress Co.*, 112 Mo. App. 49, 86 S. W. 873; *Lamont v. Railway*, 9 Heisk. (Tenn.) 58; *Moffatt Com. Co. v. Union Pacific R. Co.*, 113 Mo. App. 544, 88 S. W. 117."

In the case of *Fentiman v. Atchison, T. & S. F. Ry. Co.*, 44 Tex. Civ. App. 455, 98 S. W. 939, it is said:

"While it may be conceded that mere negligence will not render one person liable to another for a loss which the latter would not have sustained had there been no such negligence, unless the negligence was the proximate cause of the loss, yet, on the other hand, it is well settled that, if the negligence of one person with reference to the duty he owes to another concurs with an accidental cause resulting in injury to whom such duty is owed, the negligent person must answer for the consequences as though his negligence were the sole cause of the loss. *G., C. & S. F. v. Boyce* [39 Tex. Civ. App. 195] 87 S. W. 397."

Now, applying the principle underlying the above authorities, it seems evident that if the circumstances of the May flood gave notice and warning to the defendant that its construction was inadequate to meet the conditions that had occurred, and might reasonably be expected to occur again, it was then the duty of the defendant, within a reasonable time, to change its construction, and enlarge its waterways so as to meet the conditions then to be reasonably anticipated. The proof shows that the May flood was eight feet higher than any preceding flood; that the waterway under the bridge was choked and clogged up by trees, brush, and other debris which lodged against the piling upon which the bridge rested; that defendant sent its wrecking crew with equipment to dislodge and remove these obstructions; that the water backed up over plaintiffs' lands, and damage to property resulted, for which suit was promptly brought, etc. The flood out of which this suit arose came the following October, and was a few feet higher than the May flood; and, having read the entire record, it would be arbitrary and unwarranted in us to say that there was no evidence to submit to the jury on the question of the negligence of the defendant in maintaining its bridge and embankment after the knowledge brought to it by the May flood in such a way as to be a contributing, and present concurring, proximate cause of the injury occasioned. The instructions sufficiently covered this phase of the case.

2. The defendant's contention that the instructions are mere abstract statements of the law, and therefore prejudicial, is not seriously discussed in the brief, except on the theory that no instructions, save one to find for defendant, could have been cor-

ıectly given. In this connection, it is not amiss to say that the entire series of instructions was very favorable to the defendant. In fact, eight of the separate instructions were given as prepared by the defendant; and, if we are correct in holding that the case was properly sent to the jury, and we have no doubt of it, no complaint is or could be fairly made to the instructions given.

3. The defendant contends that the plaintiffs were not entitled to recover for the value of the distillery plant and the twenty barrels of whisky destroyed. This contention is based on sections 1 and 13 of article 3 of the act of the Legislature approved March 24, 1908 (Laws 1907-08, c. 69, art. 3). Section 1 of the act makes it unlawful to have possession of liquors with the intention of violating any of the provisions of the prohibition act. Section 13 provides:

"There shall be no property rights of any kind whatsoever in any liquors, vessels, fixtures, bars, furniture and implements kept or used for the purpose of violating any provisions of the act."

Section 1, *supra,* is invoked to prevent a recovery for the whisky, on the theory that it was possessed with the intention of violating the law; section 13, to prevent a recovery for the distillery plant, on the theory that it was there for the purpose of manufacturing whisky in violation of law. The case of *Blunk v. Waugh et al.,* 32 Okla. 616, 122 Pac. 717, is cited as controlling the question. We think, however, that the facts of this case take it outside the doctrine of the Blunk case, and also of the case of *O. F. Haley & Co. v. State et al., ante,* 125 Pac. 736, which applies the principle of the Blunk case. In this case the distillery, which consisted of machinery, boilers, engines, stills, and equipment, was purchased and erected at the place where destroyed, before the advent of statehood, at a time when its use in the manufacture of whisky was lawful. It could not have been the intention of the Legislature, even if it had the power, to destroy *ipso facto* the property character of this plant. It was not attempted to be shown that this property was used since the passage of the law in manufacturing whisky. Had it been so used, and were it being kept to be so used, an entirely different prop-

osition would be before us. The whisky recovered for was likewise made at a time when its manufacture was lawful. It was made under federal supervision, under the eye of a federal offi · cer, and, when produced thus lawfully, it was immediately placed in the possession of the United States, where it still remained when washed away. As far as the whisky sued for is concerned, while it was owned by plaintiffs, it was not in their possession for the purpose of violating the law, or for any other purpose. If the plaintiffs had included in the suit any whisky that had been released by the government upon the payment of tax, then the intention relative to such whisky they had reduced to actual possession might have been a pertinent inquiry, but no such whisky was in suit. But it is contended that because since statehood the plaintiff Johnson had made a contract with his co-plaintiff, Mantz, to sell him a half interest, in case 'he made certain payments, in all the property he possessed, including the farm, houses, live stock, distillery, and goods on hand, this made him such a wrongdoer as to close the door of the court against him. We do not think so. The distillery plant had value for other purposes than that of distillation. It could be easily transformed into a mill. The machinery would operate a gin, and could have been converted into many uses. Mr. Mantz lived in another state, and it certainly would not have violated the spirit and intention of the law to have shipped these original packages lawfully acquired to another state where the goods could find a lawful market.

The principle involved in a recent case decided by the Su· preme Court of Alabama we think applicable · to the facts here relative to including the whisky in a contract for the sale of all the property; it being but a relatively small part of the transac· tion. In that case (*Lang v. Holley,* 58 South. 254), a reversal was asked of a judgment on a note for the purchase price of a stock of drugs because 30 gallons of whisky was included in the sale. Alabama is committed to the doctrine that, if a part of the consideration of ·a note involves a violation of a penal law, no recovery can be had on the note. Stringent prohibition stat· utes, including the dispensary system, were in force. In sustain· ing the validity of the judgment on the note, which involved the

holding that including the whisky lawfully in possession in the sale of the entire stock did not violate the intention of the penal statutes, the court says:

"In the present case it cannot be doubted that a druggist in the legitimate pursuit of his business had a right to purchase from the dispensary such liquors as were needed in compounding medicines, to keep them as a part of his stock of drugs, and, when so compounded in good faith, he could sell them without liability. It necessarily follows that, if so having them he desires to sell out his entire business to another, he might do so without violating the law; and the mere fact that such liquors were a part of the stock of goods for which the note was given did not render the note illegal and void."

That excellent publication, Central Law Journal (vol. 74, p. 414), in an editorial review of the above decision, after stating the facts and quoting as we have here, says:

"Two dissenting judges say this was the ingrafting of an exception upon a statute which made a sale of spirituous liquors otherwise than through a dispensary a penal offense. The majority opinion refers to Endlich on Interpretation of Statutes for the rule 'that a thing which is in the letter of the statute is not within the statute unless it be also within the meaning of the Legislature.' This is an ancient rule, and it is a good one, and we see nothing in the dissenting opinion disputing either its being a salutary rule or that this sale does not come within it; that is to say, it does not dispute the assumption by the majority opinion that such a sale was not 'within the meaning of the Legislature.' It is admitted a druggist can buy and make liquor a part of his stock, and, when he sells that stock to another druggist, the liquor is in exactly the lawful situation it was before the sale."

4. This objection goes to the refusal to permit one of the plaintiffs to be asked if he had not been convicted of violating the prohibition law. The question was competent as touching the credibility of the witness. *Hendrix v. State,* 4 Okla. Cr. 611, 113 Pac. 244; *Crawford v. Ferguson, Judge,* 5 Okla. Cr. 377, 115 Pac. 278. And there might be cases where the decision would be so dependent on the evidence of the witness attacked that a refusal of the testimony would require a reversal of the case. But this case in none of its material phases depended for its correct decision on the testimony of this witness. The loss of the

houses, machinery, live stock, corn, hay, and whisky destroyed, together with the value of most of it, was testified to by neighbors, who were not attempted to be discredited. The testimony of this witness relative to the flood was quite in harmony with that of many witnesses, and has been quoted in the brief of defendant, as favorable to its contention. In the main, his testimony was cumulative of that of numerous witnesses, and presented no sharp conflict with any evidence offered by defendant, or that was otherwise in the case. Therefore, under the facts of this case, while the court should have allowed the evidence, the failure to do so could not have, in the very nature of things, affected the result, and for that reason, under our statute (section 5680, Comp. Laws 1909), should not work a reversal of the case.

5. This objection goes to the refusal to permit an answer to a certain question propounded to defendant's expert witness. The question asked was:

"Q. State to the jury what effect, if any, the amount of water which came down the Canadian river, as indicated by the high-water marks, would have had in your opinion, and, basing that opinion upon your experience and knowledge as an engineer from the observations and surveys you have made there, on the property, improvements, and live stock located on Mr. Johnson's place, if there had been no railroad across the valley."

The objection was interposed that the reply called for was as to the effect of the flood on the property, and not as to the effect the absence of the bridge would have had on the flood. This objection was sustained; the court remarking:

"The engineer knows whether or not this (bridge) obstructed the water, and to what extent, and then the jury can draw their own conclusions."

After the suggestion by the court the expert was then asked the question:

"Well, please state what effect, if any, the existence of the bridge and dump there had upon the water coming down that valley."

In answer to this and kindred questions developing the subject the expert was permitted to give his opinion, and his reasons for believing that the bridge and embankment had but slight effect upon the flood waters, and that without them the flood

would have destroyed and damaged the property to the same extent it did. Nearly two pages of the record are devoted to the testimony of the expert along the lines of the question refused by the court when slightly changed in form. We think this objection without merit.

6. In the trial of this case it appears from the evidence of both sides that the bridge and part of the embankment were washed out in the October flood, and were immediately replaced by the defendant, and the opening under the bridge left a little wider than it was before the flood. The defendant developed these facts from its own examination of two of its bridge foremen. At least one of plaintiffs' witnesses mentioned the matter. No objections were offered to any of the testimony by either side, and little importance seems, at the time, to have been attached to it. This question, involving subsequent repairs, provoked no discussion at the time the evidence was being taken.

The defendant urges here, however, that the court committed reversible error in refusing to give two certain instructions intended to meet the question. One of these requested instructions does not need discussion. The other, it is claimed, presented to the jury the question of repairs or changes subsequent to the injury. It follows:

"The court instructs the jury that the fact that the defendant company altered its roadbed with respect to culverts and bridge subsequent to its original construction is no admission that its original construction was faulty, nor is there any presumption of law arising from such facts that the original construction was faulty or unskillful."

The rule is well established that evidence of repairs or alterations subsequent to an accident or injury is not admissible to show faulty or negligent original construction of the instrumentalities in use at the time of the injury. On this point Cyc. at page 1428 says:

"While there is some conflict upon the question, the undoubted weight of authority is to the effect that evidence that after an accident resulting in injury the master took precautions against its recurrence is not admissible to show negligence on his part." (See authorities cited:)

The reasons stated for the rule by the Supreme Court of Minnesota in *Morse v. Railway Co.*, 30 Minn. 465, 16 N. W 358, in overruling former decisions, has been quoted with approval in *Nalley v. Hartford Carpet Co.*, 51 Conn. 524, 50 Am. Rep. 47, and by a number of the other courts. It follows:

"But on mature reflection we have concluded that evidence of this kind ought not to be admitted under any circumstances, and that the rule heretofore adopted by this court is on principle wrong, not for the reason given by some courts, that the acts of the employees in making such repairs are not admissible against their principals, but upon the broader ground that such acts afford no legitimate basis for construing such an act as an admission of previous neglect of duty. A person may have exercised all the care which the law required, and yet in the light of his new experience, after an unexpected accident has occurred, and as a measure of extreme caution, he may adopt additional safeguards. The more careful a person is, the more regard he has for the lives of others, the more likely he would be to do so, and it would seem unjust that he could not do so without being liable to have such acts construed as an admission of prior negligence. We think such a rule puts an unfair interpretation upon human conduct, and virtually holds out an inducement for continued negligence."

This rule, however, deals with repairs 'or alterations made after, and in the light of, the accident or calamity that has happened. The above instruction, it is claimed, was intended to meet this purpose. But it is evident at a glance that it covers a much wider field. That it embraces the question of any repairs or alterations since the original construction of the road several years before this flood, including the period between the May, 1908, flood, and the October flood, out of which this suit arose.

The defendant concedes that the instruction is inaccurately drawn, but insists that, as the evidence was directed to alterations subsequent to the October flood, it would not have been misleading. We think defendant is in error as to what the record shows in this regard. A Mr. Ward testified that after the original construction of the embankment, about the year 1903 or 1904, a flood washed out about 200 yards of it, and it was repaired and replaced One of the defendant's bridge foremen stated that this bridge was on his division; that he had worked on it off and on all the

time, and had worked on the bridge some after the May flood and prior to the October flood. Another of defendant's bridge foremen testified that he had worked a number of times on this bridge, repairing it, prior to the October flood. These items of evidence are probably not very material one way or the other, but may have been responsible for the particular language used in the instruction refused by the court; and to have given it as offered might have been confusing and misleading to the jury, in view of the importance that we attach to the May flood, and the conditions it developed, and the knowledge and new duties it brought to the defendant in regard to the necessities of the situation, and the danger of continuing to maintain the bridge and embankment as originally constructed, the vital point relating to maintenance rather than original construction.

In cause No. 1,446, on the docket of this court, between these same parties, a decision was rendered (30 Okla. 754, 120 Pac. 1100), in which it was ordered that in the event of an affirmance in this case, such affirmance should be on condition that a *remittitur* be entered in this suit in the sum of $248. Therefore, finding no substantial error in the record, this case should be affirmed upon the filing of a *remittitur* as above stated.

By the Court: It is so ordered.