BOARD OF EDUCATION OF THE BOROUGH OF MANASQUAN, *ET AL.*, PLAINTIFFS-RESPONDENTS, v. THE STATE OF NEW JERSEY DEPARTMENT OF TRANSPORTATION, DEFENDANT-RESPONDENT, AND THE NEW YORK AND LONG BRANCH RAILROAD COMPANY, DEFENDANT-APPELLANT.

Argued October 21, 1975—Decided January 20, 1976.

*Mr. Laurence M. McHeffey* argued the cause for defendant-appellant (*Messrs. Hanlon, Amdur & Hanlon,* attorneys; *Mr. Richard A. Amdur,* of counsel; *Mr. McHeffey,* on the brief).

*Mr. John D. Wooley* argued the cause for plaintiffs-respondents.

The opinion of the Court was delivered by
CONFORD, P. J. A. D., Temporarily Assigned. The principal question on this appeal is whether a railroad which

piped a natural watercourse under its embankment when the tracks were laid many years ago is subject to injunction on the complaint of upstream owners for flooding attributable to the fact that the pipe will no longer accommodate the volume of water which now flows through the watercourse. That volume has increased substantially because of upstream housing and commercial development over the past 25 years. The Law Division granted a mandatory injunction calling for the widening of the passageway under the railroad embankment, and the Appellate Division affirmed on the trial court's oral opinion. We granted certification, 67 *N. J.* 92 (1975), and we now affirm.

Separate actions were brought by plaintiffs Board of Education of the Borough of Manasquan and Borough of Manasquan against The New York and Long Branch Railroad ("Railroad") and the State Department of Transportation for injunctions to abate a nuisance. The actions were consolidated and heard by Judge Lane sitting without a jury.

Stockton Lake Brook is a natural stream which flows easterly for 2.6 miles from its source west of Route 35 in Wall Township through the northwest portion of the Borough of Manasquan into Stockton Lake, an arm of the Manasquan River. The watershed area drained by the brook contains 735 acres in Wall Township, Manasquan Borough, and Sea Girt.

The plaintiff Board of Education maintains an elementary school and an adjoining school playground along the northern bank of the brook. Across Broad Street to the west is Manasquan High School. The brook flows through the high school property and thence easterly through a brick 5 by 4 foot culvert under Broad Street and between natural banks along the southerly edge of the elementary school playground. Four hundred feet east of Broad Street it passes under a gravel driveway bridge connecting the school yard with another street to the south by means of a 36-inch diameter pipe.

Immediately east of the school property the brook passes under State Highway Route 71 by means of a 10 by 6 foot box culvert. The defendant State Department of Transportation installed the culvert in 1971 with the approval of the Division of Water Resources when the highway was renovated. A bulkhead or dam was placed across the downstream outlet of the culvert, so as to prevent a wash-out of the nearby railroad embankment in times of flood, with a hole 30 inches in diameter to allow the water to pass through at the pre-1971 level.

After passing under Route 71, the brook flows through a low swampy area heavily covered with brush for about 75 feet to the right-of-way of the defendant railroad. At this point the railroad traverses a large embankment under which the brook waters pass through a 24-inch diameter cast iron pipe. All surface drainage from the 735-acre watershed area must funnel through this pipe. The pipe was there in 1920 and was probably installed before 1900.

Three or four times each year during periods of heavy rainfall the brook overflows its banks and floods the elementary school playground. The flooding began at least 11 years ago and typically covers two-thirds of the school yard to depths of up to 5 feet, leaving a residue of mud and debris which makes the playground unusable for several days. The overflow also floods the home economics and band room in the basement of the high school across the street.

The school board's drainage engineer, qualified as an expert, testified that the immediate cause of the flooding is the railroad's 24-inch pipe, which backs up the stream all the way to the school yard. The 24-inch pipe is "inadequate" to accommodate the surface drainage from the watershed area. As distinguished from the area west of the pipe, there is no flooding east of the pipe. The witness was of the opinion that if the Route 71 bulkhead were removed but the railroad culvert not improved it would reduce the flooding on the school playground to the extent that it is caused by debris

build-up in the dam, but it would not significantly alleviate the general flooding problem.

Several recent developments in the watershed area upstream have contributed to the increase of the runoff, rendering the railroad drainage pipe inadequate. Since 1954 two shopping centers, an apartment building and a small housing development have been built in Wall Township, and another 20-house development was erected in Manasquan.

The flooding is hazardous to the safety of the school children and other passers-by, who could fall and be swept into the 8-foot deep water surrounding the Route 71 culvert at flood times. The president of the school board testified that the flooding interfered with the operation of the school playground. It would certainly hinder the construction of a proposed new school addition on the old playground area.

The expert engineer concluded there was no other way to divert the drainage than to enlarge the opening under the railroad embankment, possibly by jacking additional pipes underneath. He testified that the railroad drainage facility should have at least the same "hydraulic characteristics" as the Route 71 culvert, with a 60-square foot opening, to adequately accommodate the water flow. Once the railroad drainage facility was improved, the dam in the highway culvert could be removed without damaging the railroad embankment. No opposition expert proof was offered by the railroad.

The judgment entered by Judge Lane called for the railroad to propose a plan for approval by the State Division of Water Resources to construct a drainage facility having the same hydraulic characteristics as the Route 71 culvert. Upon approval, and completion of construction by the railroad, the State Department of Transportation was ordered to remove the temporary dam from the Route 71 culvert.

This court's decision in *Armstrong v. Francis Corp.*, 20 *N. J.* 320 (1956), resolved conflicting currents in prior New Jersey cases as to the law governing the liability of the landowner who alters the flow of surface waters with resulting

material harm to other landowners. Previously New Jersey had followed variations of the "common enemy" rule, which, with exceptions designed to cope with particularly offensive kinds of interference with normal flow, permitted every owner to get rid of undesirable water in whatever fashion he chose, whatever the effect on others. The then state of the law was well-delineated in the Appellate Division decision of *Yonadi v. Homestead Country Homes*, 35 *N. J. Super.* 514, 517–521 (1955). The summary of the law in *Yonadi* stressed the dominance of property law principles, with the emphasis on uniformity, *stare decisis*, and predictability of rights and obligations characteristic of property law. *Id.* at 520, 521, 524.

*Armstrong* repudiated the property law approach of *Yonadi* and the older cases in favor of the concept of reasonable use, 20 *N. J.* at 329, governed by tort rather than property law notions, 20 *N. J.* at 326. See Hanks, The Law of Water in New Jersey, 22 *Rutgers L. Rev.* 621, 705–711 (1968); *Restatement of Torts* (1939) § 833, Comment, Illustrations 1 and 2, pp. 270–271. Justice Brennan stated in *Armstrong* (20 *N. J.* at 330):

> The rule of reasonableness has the particular virtue of flexibility. The issue of reasonableness or unreasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter.

A balancing of the factors noted, plus such other considerations as may bear upon the reasonableness of requiring the railroad to remedy the harmful situation before us, produces accord with Judge Lane's determination. It may readily be conceded that the railroad acted reasonably in the first instance in constructing a 24-inch passageway for a country stream in turn-of-the-century Monmouth County. Because of the peculiar attributes of railroad operation — namely, its use of long stretches of land traversing numerous

streams — the reasonableness of its maintenance of an artificial contrivance on a waterway is not determined solely by the circumstances as of the time of installation but also by those which in fact eventuate. This is attested by substantial authority specifically concerning obstruction of watercourses by railroads.

In *Riddle v. Baltimore & Ohio R. R. Co.*, 137 *W. Va.* 733, 73 *S. E.* 2d 793 (Sup. Ct. of App. 1952) a railroad was held liable for flood damage in similar circumstances. A culvert under the railroad's embankment backed up during an unusually severe rainstorm and flooded plaintiff's home upstream, 1,300 feet from the culvert. The culvert was constructed in 1895 when the surrounding area was unimproved meadowland, while the town was built after 1915. Floods had occurred irregularly in the past, and typically affected different areas of the town. The railroad contended this was a particularly severe rainstorm and the flood damage was therefore excusable as due to an unforeseeable Act of God.

The West Virginia Supreme Court of Appeals held that a railroad which constructs a culvert in its roadbed must provide for such floods as may reasonably be anticipated in view of the local climate and history, and although the railroad may have used reasonable care in the original construction of the culvert, if subsequent developments prove that it is insufficient it becomes the duty of the railroad to improve the culvert to meet the changed condition. 73 *S. E.* 2d at 800.

The same principle has been applied to hold railroads accountable where flooding is caused solely by a sudden rainstorm, without the added problems caused by gradual urban development. In *Missouri, K. & T. Ry. Co. v. Johnson*, 34 *Okla.* 582, 126 *P.* 567 (Sup. Ct. 1912), plaintiff's farm was flooded after an unprecedented heavy rainfall because water was backed up by a railroad bridge and embankment downstream. He alleged negligence in the construction and maintenance of the railroad bridge and embankment. The railroad claimed its facilities were properly constructed and

relied on the defense of Act of God. In rejecting the contention the court said:

* * * We * * * concede that, when the railroad embankment and bridge were erected in 1903-04, they were erected skillfully and sufficiently to meet the flood conditions of the river, then known, as well as those that might be at that time reasonably anticipated * * *. If, however, after the original construction of the road, and prior to the flood in question here, other floods of an unprecedented character came, demonstrating the faulty construction of the road-bed, or the inadequacy of the waterway left under the bridge, then, if such was the case, a new standard of obligation was erected for the defendant, and it was its duty to meet the new conditions thus established. 126 *P.* at 569.

To the same general effect: *Federer v. Northern Pac. Ry. Co.,* 77 *N. D.* 169, 42 *N. W.* 2d 216, 222 (Sup. Ct. 1950); *Missouri Pac. Ry. Co. v. Nichols,* 170 *Ark.* 1194, 279 *S. W.* 354, 356 (Sup. Ct. 1926); *Schwank v. Platte County,* 152 *Neb.* 273, 40 *N. W.* 2d 863, 868 (Sup. Ct. 1950) (highway embankment); *Cache River Drainage Dist. v. Chicago & E.I.R. Co.,* 264 *Ill.* 97, 105 *N. E.* 699, 701 (Sup. Ct. 1914).

Railroads have also been held liable for flooding caused by the natural accumulation of sediment in a drainage facility under their tracks which renders it inadequate. In *Chesapeake & O. Ry. Co. v. Saulsberry,* 262 *Ky.* 31, 88 *S. W.* 2d 949, 950–951 (Ct. App. 1935), the court notes:

The law imposes no duty upon a railroad company or any other lower proprietor to remove debris out of a channel immediately after it collects * * *, but it does impose the duty to do so within a reasonable time. It likewise imposes the continuing duty of exercising reasonable care and diligence to maintain its bridges and culverts with openings sufficient to permit the free passage of water during normal times, which includes storms and floods likely to occur or reasonably to be expected by persons of ordinary experience and prudence, and not cause the flow to be retarded by inadequate openings so as to back it up and damage upper riparian owners.

Here again the railroad was held to have a continuing duty to remedy an unsafe condition which was unanticipated at

the time its drain was constructed, but which later became foreseeable. The court concluded:

\* \* \* The provisions originally adequate for the escape of the water, according to the plaintiff's evidence, had become inadequate. 88 *S. W.* 2d at 951.

See also, in general support of the foregoing, 93 *C. J. S. Waters,* § 20, p. 628. *Cf. Hopler v. Morris Hills Regional District,* 45 *N. J. Super.* 409 (App. Div. 1957).

The railroad invokes the authority of *Kidde Manufacturing Co. v. Bloomfield,* 20 *N. J.* 52 (1955), as militating against the imposition of liability on it in these circumstances. The *Kidde* opinion was written by Justice Brennan and filed shortly before his decision for the court in *Armstrong.* It is cited in the latter opinion as authority for imposition of liability "in the case of artificial construction on one's land whch unreasonably speeds the waters of a stream past one's property onto that of an owner below, causing harm." 20 *N. J.* at 327. The railroad interprets *Kidde* as authority to the effect that an upstream owner has no cause of action for interference with a stream by a downstream owner, basing its position on the fact that the court there relieved the defendant Town of Bloomfield of liability for improvements to a stream below plaintiff's property, allegedly causing greater velocity of the water in passing plaintiff's property, with attendant damage thereto. But defendant misconceives the case. Bloomfield was absolved because the court found it not to have been negligent, and because plaintiff's own alterations of structures in the stream had contributed materially to the damage. 20 *N. J.* at 67, 68.

There is no support in *Kidde* for the abstract proposition that a lower owner on a stream may not, merely by reason of relative location, be liable to an upper owner for flood damage caused by unreasonable conduct in relation to the flowage of the water. Indeed, the court in *Kidde* referred, with apparent approval (20 *N. J.* at 59–60), to the *dictum* in *Murray Rubber Co. v. Trenton,* 103 *N. J. L.* 43, 47 (Sup.

Ct. 1926), aff'd o.b. 105 *N. J. L.* 496 (E. & A. 1929), that: "Standing alone, we are not prepared to say that the negligent construction and maintenance of its bridges by the county, in such fashion as to impede the flow of water and cause its damming on the plaintiff's land, does not create a cause of action."

There is thus nothing in our law to warrant disagreement with the general body of doctrine elsewhere, discussed above, concerning the continuing duty of railroads or other obstructers of watercourses to accommodate their structures to the passage of such increasing volume of waters as is attendant upon area development, so as not to visit flood damage upon others.

Defendant further contends that it is "inequitable" to compel it to bear the entire expense of rectifying a condition allegedly due most proximately to the activities of upstream developers, producing unnatural increased runoff of surface waters into the stream. We are not here confronted with the question whether such developers might have been liable to plaintiffs, alone or jointly with the railroad, had they been joined as defendants. But the fact that the damage sustained by the plaintiffs is the causal result of actions by more than one person will not, under familiar tort principles, excuse one who has contributed substantially thereto, if the conduct is otherwise actionable. *Rappaport v. Nichols,* 31 *N. J.* 188, 203–204 (1959).

Judgment affirmed; no costs.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For reversal*—None.